**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISON**

CASIE PARKER, *on her own behalf*
*and on behalf of her minor daughter,*
K.P.,

                                         Case No.

        Plaintiffs,

v.                                    Hon.

PUBLIC SCHOOLS OF PETOSKEY,
DEIDRA GAMBLE, JOEL DOHM,
NATE GROSS, and SARA JONKER,

        Defendants.

---

Grace Cathryn Cretcher (NY 5158712)
NACHTLAW, P.C.
*Attorneys for Plaintiffs*
501 Avis Drive, Suite 3
Ann Arbor, MI 48108
(734) 663-7550
gcretcher@nachtlaw.com

---

## **COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff CASIE PARKER ("Plaintiff Parker"), on her own

behalf and on behalf of her minor daughter K.P., and by and through her attorneys,

NACHTLAW, P.C., hereby alleges as follows:

### **INTRODUCTION**

1.      Plaintiff Parker is a well-known and respected figure in the Michigan

1

volleyball community, having played college volleyball in the state and coached high school volleyball for over 25 years and 106 seasons.

2.      At the time she was terminated as varsity volleyball coach by Defendant Public Schools of Petoskey in 2023, Plaintiff Parker served as the Northern Michigan regional representative to the Michigan Interscholastic Volleyball Coaches Association, mentoring high school players and coaches across the state and contributing to the selection of the all-state team.

3.      As a result of the wrongful termination described herein, not only has Plaintiff Parker's reputation in the Michigan volleyball community—an incredibly important part of her life for decades—been decimated, her reputation in her own local community as a whole has been materially tarnished.

4.      Plaintiffs bring this action against Defendants for violation of the United States Constitution, Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq*., 29 U.S.C. § 3248, Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2101 *et seq*., and Michigan common law.

## PARTIES, JURISDICTION, AND VENUE

5.      Plaintiff Casie Parker is an adult individual residing in Emmet County, Michigan and is employed as a marketing teacher, business teacher, and DECA advisor at Petoskey High School by Defendant Public Schools of Petoskey.

2

6.    Plaintiff K.P. is Plaintiff Parker's minor daughter and a student at Petoskey High School.

7.    Defendant Public Schools of Petoskey ("the District") is a public school district in Emmet County, Michigan.

8.    Defendant Deidra Gamble is employed by the District as the Principal of Petoskey High School and is an adult individual residing in Emmet County, Michigan.

9.    Defendant Joel Dohm is employed by the District as the Athletic Director of Petoskey High and Middle Schools and during the events described herein was employed as Vice Principal of Petoskey High School, and is an adult individual residing in Emmet County, Michigan.

10.    Defendant Nate Gross is a fellow teacher employed by the District at Petoskey High School and an adult individual residing in Emmet County, Michigan.

11.    Defendant Sara Jonker is an adult individual residing in Emmet County, Michigan.

12.    Venue is appropriate under 28 U.S.C. 1391(b)(1) and (2), as Defendants are domiciled in this Court's judicial district, and because the events giving rise to this lawsuit took place therein.

13.    This action arises from violations of the Title IX and the Equal Protection Clause, and as such, this Court has original, federal question jurisdiction

pursuant to 28 U.S.C. 1331 and federal civil rights jurisdiction pursuant to 28 U.S.C. 1343.

14.    This Court also has supplemental jurisdiction over the state claims pled herein pursuant to 28 U.S.C. 1367.

15.    Plaintiff Parker has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission and will move to amend this Complaint to assert additional claims against Defendants pursuant to Title VII of the Civil Rights Act of 1964 upon receipt of her notice of right to sue.

## FACTS

16.    Plaintiff Parker was first hired by the District to coach middle school volleyball in 2002 and first hired as a marketing teacher at Petoskey High School ("PHS") at the beginning of the 2013-14 school year.

17.    Plaintiff Parker was first hired to coach the PHS varsity volleyball team during the 2019-2020 school year.

18.    Until 2022, Plaintiff Parker received exclusively positive feedback and reviews.

19.    From the beginning, however, Plaintiff Parker was uncomfortable with the treatment of women's sports teams at PHS, most obvious from the large disparities in quality of facilities and coaching provided to them in comparison to the men's teams.

20.    As one of only two female head coaches at PHS, both of whom have now left due to the male-dominated atmosphere or been fired, Plaintiff Parker was excluded from this boy's club and subjected to differing standards from the start of her time at the school.

21.    Although the athletic department provided water jugs and hired and paid for scorekeepers for all the other sports, no such accommodations were provided for the volleyball team while Plaintiff Parker was coach. When she asked Defendant Dohm to allow her team access to these same resources, he refused.

22.    Plaintiff Parker was the only varsity coach who was not provided an extra key to the PHS gym for her assistant coach, as Defendant Dohm said that "too many people had keys."

23.    These people included the assistants of the male head coaches at PHS, as well as several parents who used the gym on the weekends with Defendant Dohm's knowledge. By contrast, as a result, Plaintiff Parker's players were forced to pay for their own gym memberships to work out outside of volleyball season.

24.    The disrespect and disregard Plaintiff Parker contended with from other coaches and Defendants Gamble and Dohm—which she continues to contend with to this day in her ongoing employment as a PHS teacher—was and is in stark contrast to both the way the otherwise almost exclusively male coaches are treated by

coworkers at PHS and the support and responsiveness they receive from Petoskey administrators.

25.    During the 2021-22 school year, another Petoskey teacher, Nate Gross, began to aggressively approach and confront Plaintiff Parker during volleyball season to express his strident disapproval of her coaching decisions vis-à-vis his daughter, who played on the varsity volleyball team.

26.    Defendant Gross is a close friend of the Petoskey Athletic Director and Assistant Principal, Defendant Joel Dohm, and their children were romantically involved.

27.    Defendant Dohm pointedly ignored this heckling and harassment throughout the 2021-22 season.

28.    By the end of the season, Defendants Gross and Dohm were baselessly accusing Plaintiff Parker of removing Defendant Gross's daughter from the volleyball team, which had not occurred.

29.    Plaintiff Parker continued to experience harassment throughout the school year, receiving various abusive calls and text messages concerning Defendant Gross's daughter and the varsity volleyball team.

30.    On one occasion in February of 2022, Defendant Gross blew up at Plaintiff Parker so violently and aggressively in public because his daughter had not

been one of the starting players in a recent game that Plaintiff Parker was left shaking and in tears on school grounds.

31.     Plaintiff Parker approached Defendant Dohm about the incident the next day, and he promptly told her that it wasn't his problem.

32.     Repeated emails about the incident to Principal Deidra Gamble were similarly ignored and given the frequency with which Plaintiff Parker was forced to encounter Defendant Gross, she began to feel terrorized and anxious at work.

33.     Finally, in June of 2022, Ms. Gamble responded to Plaintiff Parker's repeatedly expressed concerns about how Defendant Gross was treating her by informing her that Ms. Gamble had spoken with Defendant Gross, and she did not believe he was harassing Plaintiff Parker, but just being "mean."

34.     Two days later, Plaintiff Parker was informed by coworkers that Mr. Gross had told them that Ms. Gamble said she "had his back" against Plaintiff Parker.

35.     When Plaintiff Parker confronted Ms. Gamble about this, Ms. Gamble's only response was that she couldn't believe Defendant Gross had shared their conversation.

36.     Defendant Gross also repeatedly defamed Plaintiff Parker throughout the 2021-22 and 2022-23 school years, baselessly impugning her professional expertise as a coach, falsely accusing her of benching his daughter and other

invented transgressions, and falsely portraying her in a negative light to PHS administrators, teachers, and students on a consistent, ongoing basis.

37.    In the fall of 2022, Defendant Dohm told the Alpena High School athletic director that he was going to "get rid" of Plaintiff Parker. The varsity volleyball coach at Alpena then came to Plaintiff Parker and told her what Defendant Dohm had said, explaining that his athletic director was concerned and thought it odd that he would say that.

38.    Throughout volleyball season, Plaintiff Parker repeatedly attempted to meet with Defendant Dohm about various issues, but he categorically refused all her requests.

39.    Finally, just a few weeks before the end of the 2022-23 volleyball season, Defendant Dohm asked Plaintiff Parker to speak with him in his office, advising her to bring a union representative.

40.    During this meeting, Defendant Dohm informed her that she was being suspended, first citing the fact that she texted players as explanation.

41.    When Plaintiff Parker responded that all coaches text players, that there were no rules against this, and that her own daughter had been texted by the basketball coach the night before, Defendant Dohm jumped to vague, baseless, and defamatory allegations that Plaintiff Parker "pitted girls against one another."

42.    Finally, Defendant Dohm accused Plaintiff Parker of having an inappropriate conversation in front of her players because a parent had remarked to her while they were riding in a car with their daughters and two other students that players in general weren't as tough as they used to be.

43.    Plaintiff Parker finds the characterization of this conversation as inappropriate laughable given the broader context of PHS's almost exclusively male coaching staff who use explicit profanity with their players—including female players—on a regular basis.

44.    Within days, although Plaintiff Parker had only been suspended, Defendant Dohm removed her name from the PHS athletic website and called the state to have her removed from the coaches' association and as the representative for Northern Michigan.

45.    Shortly thereafter, to her complete heartbreak, Plaintiff Parker was removed from her varsity volleyball coaching position without even being allowed to finish out the season.

46.    Far above and beyond losing the compensation associated with this position, this represented an enormous blow to her in terms of emotional distress and reputational damage because of her long history and deep involvement with volleyball in Michigan.

47.    In this context, being summarily and baselessly terminated after decades of service was incredibly embarrassing and devastating for Plaintiff Parker.

48.    Adding insult to injury, Defendant Dohm also gave Plaintiff Parker her first ever negative coaching evaluation for the 2022-23 school year, made up largely of easily disprovable lies and dramatic mischaracterizations.

49.    This unfair negative evaluation, clearly created as a pretextual justification for her termination, even faulted her for occasionally sitting while coaching during games – as most coaches do – because she suffers from vascular syncope, a physical disability that impacts her ability remain on her feet.

50.    The egregiousness of the treatment Plaintiff Parker received from Defendants—including the hostility and defamation she faced and the adverse employment actions taken against her—is again driven home by the larger context, in which, just a few years prior, it had been revealed that a male former Petoskey softball coach had used school resources to run a travel team program and tournament before personally pocketing the over $35,000 raised each year for many years, with absolutely no repercussions whatsoever.

51.    In fact, during Plaintiff Parker's time coaching at PHS, she became aware of complaints made against the softball coach, girls soccer coach, hockey coach, baseball coach, girls basketball coach, football coach, wrestling coach, and

athletic trainer—all of whom were male—all while Defendant Dohm served as Athletic Director.

52.    These included complaints about financial mismanagement, profanity with players, excessive punishment, sexual remarks, fat shaming, bullying, abuse, alcohol use around players, leaving players unsupervised, and even telling Defendant Dohm to "fuck off" in front of others, but none of these male coaches were terminated or even suspended.

53.    Plaintiff Parker was replaced as varsity volleyball coach by an inexperienced young woman with no varsity coaching experience, who is currently the sole female coach employed at Petoskey High School.

54.    Despite being crushed by the loss of her volleyball coaching position, Plaintiff Parker returned to teaching at Petoskey for the 2023-24 school year.

55.    In fact, given that she also has a background in softball and softball coaching and there was an open softball coach position, Plaintiff Parker even felt hopeful about her ability to continue pursuing her coaching passion at the school, given that she had previously coached softball teams to three state titles and five national tournaments.

56.    This was particularly true given that the applicable collective bargaining agreement ("CBA") provides that non-teachers may only be hired for coaching positions if no qualified teacher has applied.

57.     Unfortunately, despite this, Plaintiff Parker's hopes were dashed when to her surprise, a less qualified male coach who did not teach at Petoskey and had never coached varsity softball before was hired over her, despite her obvious qualification for the role, in direct violation of the terms of the CBA.

58.     Since that time, this new coach has treated Plaintiff Parker with open hostility despite coaching her daughter on the softball team, excluding Plaintiff Parker from team parent meetings and email communications entirely and spreading lies about her with coaching staff and players, claiming that the Athletic Director says she is a troublemaker.

59.     Plaintiff Parker's daughter, Plaintiff K.P., who, as noted, has played on both the volleyball and softball teams at PHS, has suffered ongoing discriminatory and retaliatory harassment at the school—and in fact, was dissuaded from joining the softball team during her junior year—because of the events described herein.

60.     Plaintiff K.P. has been treated with hostility by other players, who have refused to partner or interact with her during practice, and has had to endure ongoing aggressively negative and false commentary about Plaintiff Parker from students, coaches, and staff alike, with rumors being spread around the entire state volleyball community, causing her serious anxiety issues.

61.     PHS varsity volleyball parents Defendants Gross and Jonker have been ringleaders in impugning Plaintiff Parker's reputation and spreading lies about her

12

that have portrayed her in a false light—as a bad volleyball coach and a bad person—in the PHS volleyball community and beyond, resulting in significant damages to both Plaintiffs.

62.    Plaintiff K.P. attended a volleyball camp program on a college campus, and while showering in the communal bathroom, she overhead other girls talking about Plaintiff Parker, unaware that her daughter was present, triggering an anxiety attack and requiring Plaintiff Parker to pick her up early and forfeit the money spent on the camp.

63.    Worst of all, despite having made the state All-Region and All-Conference volleyball teams the prior season, Plaintiff K.P. was kept on the bench at the start of the 2023-24 season without explanation.

64.    In proceedings before the U.S. Equal Opportunity Employment Commission ("EEOC"), the District produced documentation showing that Defendants engaged in explicitly defamatory communications amongst one another and with PHS parents and students and other community members about Plaintiff Parker's qualifications and performance as varsity volleyball coach, baselessly impugning her professional reputation.

65.    These defamatory communications include statements made by Defendant Jonker to Defendant Dohm on April 18, 2023, which Defendant Dohm took notes on, transmitting them to other PHS administrators and placing them in

13

Plaintiff Parker's personal file. These statements falsely accused Plaintiff Parker of homophobia, fat shaming, leading by fear, getting "crazier and crazier," and engaging in "lots of weird stuff," falsely claiming that Plaintiff Parker "really went nuts" and baselessly noting purported concerns about her mental health.

66.    These defamatory communications also include notes taken by Defendant Dohm on September 21, 2023, transmitted to other PHS administrators, and placed in Plaintiff Parker's personal file, which falsely portray Plaintiff Parker as immature and unfairly accuse her of starting drama.

67.    These defamatory communications also include notes taken by Defendant Dohm on October 26, 2023, transmitted to other PHS administrators, and placed in Plaintiff Parker's personal file, which falsely accuse Plaintiff Parker of creating turmoil in the volleyball program, unethical conduct, and other policy violations, which were never specified or explained.

68.    These defamatory communications also include discussions between members of the softball coach hiring committee, which included Defendants Gamble and Dohm, as well as District Superintendent Jeff Leslie, Board of Education President Mark Ashley, and parent Chad Howard, on November 1, 2023, during which Defendants Gamble and Dohm falsely portrayed Plaintiff Parker as difficult, falsely accused her of repeatedly causing problems during her tenure as volleyball

coach, unjustifiably impugned her professional abilities, and falsely portrayed her as unqualified for the position to Leslie, Ashley, and Howard.

69.    These defamatory communications also include notes taken by Defendant Dohm on January 19, 2024, transmitted to other PHS administrators, and placed in Plaintiff Parker's personal file, which memorialize a phone conversation in which Defendants Dohm and Gamble falsely accused Plaintiff Parker of "saying bad things about [Dohm] in the community."

70.    At no point did Defendant Dohm meet with Plaintiff Parker about these purported concerns – in fact, he actively refused to do so – nor was she ever even informed about a single parent complaint. Plaintiff Parker first learned of these defamatory communications via the EEOC process on November 22, 2024.

71.    After her termination, Plaintiff Parker was so distraught that she was unable to sleep at night, frequently waking up crying, and she had to take a few weeks off work and see a counselor as a result.

72.    Since then, Defendants have done all they can to make Plaintiff Parker's life more difficult at every turn.

73.    Plaintiff Parker is now permanently banned from using or reserving any gyms in Petoskey, although even individuals who are not employed by the District— and therefore officially not allowed to use Petoskey facilities because they have not

undergone a background check and are unknown to the District—are in fact regularly permitted to reserve and use Petoskey gyms.

74.    Plaintiff Parker is no longer even permitted to coach for or reserve equipment or facilities through the Petoskey Parks and Recreation Department.

75.    Defendants have applied significant red tape and extra rules and requirements to the highly successful extracurricular club Plaintiff Parker runs at PHS—rules and requirements not applied to any other PHS extracurricular club.

76.    Since Plaintiff Parker's termination, she has not been permitted to work concessions at her daughter's volleyball events like the rest of the team parents.

77.    Since Plaintiff Parker's termination, her defamation by Defendants Gamble, Dohm, Gross, and Jonker has spread throughout Plaintiff Parker's local and professional communities.

78.    Plaintiff Parker has even heard through her local sports and educational communities that Defendant Jonker has a notebook in which she records false and defamatory claims about Plaintiff Parker to keep track of them for reference.

79.    Plaintiff Parker has heard—or heard about—comments made and questions asked about her and the situation by high school, league, and college volleyball coaches from all around the state, fellow softball coaches, her own former volleyball and softball players, her current and former students, referees, parents and families of players, and friends.

16

80.    This defamation, and the dissemination of it throughout her local community, has had a crushingly negative impact on Plaintiff Parker's professional and personal lives.

81.    Since her termination, Plaintiff Parker has been applying for coaching jobs she is highly qualified for at local high schools without success.

82.    At a meeting in Harbor Springs, Michigan, concerning the school district's high school volleyball program, which was attended by the district superintendent, after several parents brought Plaintiff Parker up as a potential coaching hire, another parent called her a "horrible coach" and falsely claimed she had been fired from the previous two schools she had coached at. As a result, Harbor Springs hired a coach who had never coached or even played volleyball.

83.    Similarly, in Boyne City, Michigan—a district in which Plaintiff Parker successfully coached in the past—she went through a very positive application and hiring process for a coaching position that abruptly ended with a personal call from the Boyne City Athletic Director informing Plaintiff Parker that although she had done great, they all loved her, and she was the more experienced candidate, because of the situation in Petoskey, the community would feel better if they went with another coach.

84.    Plaintiff Parker was able to coach Amateur Athletic Union volleyball last year but learned that several parents told the program's director they would not

17

let their daughters play on Plaintiff Parker's team because of what they had heard about her.

85.    In October of 2025, Plaintiff Parker, a cancer survivor who suffers from vertigo that sometimes comes on quickly and unexpectedly, was issued a written warning by PHS Assistant Principal Richard Harris simply for *inquiring* with another teacher whether that teacher could provide coverage for a single student when she was concerned an episode of vertigo might be oncoming one afternoon.

86.    Defendants have turned Plaintiff Parker's work environment into a nightmare and ostracized her from her most valued communities, resulting in serious depression and anxiety.

87.    Plaintiff K.P. has suffered a similar nightmare at school, particularly in the context of her experiences on the varsity volleyball team. Despite being one of the most talented players on the team, K.P. has been sidelined and excluded during her junior and senior years.

88.    As a result, Plaintiff K.P's volleyball career has been significantly impacted and the volleyball skills of the entire team have been hampered by losing Plaintiff Parker's expertise as coach—which is reflected in the team's stats.

89.    It is now highly unlikely that Plaintiff K.P. will be able to secure a college scholarship for volleyball, and because she overheard gossip about her

mother at a college volleyball camp, she has also developed significant fear and anxiety in dorm and university-related environments.

## COUNT I
### Discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution
### 42 U.S.C. § 1983
*(On behalf of Plaintiff Parker and as to Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm)*

90. Plaintiffs incorporate the preceding allegations as if fully restated herein.

91. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deny to any person within its jurisdiction the equal protection of the laws."

92. 42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

93. Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm acted under color of law when they engaged in the conduct described herein, including, but not limited to, discriminating against Plaintiff Parker based on her gender and terminating her employment as varsity volleyball coach.

94. Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm thereby violated Plaintiff Parker's clearly established constitutional rights, of

19

which any reasonable person in their position would have known; the individual

Defendants are therefore not entitled to qualified immunity.

95.    As a direct and proximate result of Defendants' unlawful actions,

Plaintiff Parker has suffered significant harm, injury, and damages, including, but

not limited to, removal from her position as varsity volleyball coach, loss of income;

loss of career opportunities and earning capacity; mental and emotional distress;

humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT II**
**Retaliation in violation of the Equal Protection Clause of the Fourteenth
Amendment to the U.S. Constitution
42 U.S.C. § 1983**
*(On behalf of both Plaintiffs and as to Defendants Public Schools of Petoskey,
Deidra Gamble, and Joel Dohm)*

96.    Plaintiffs incorporate the preceding allegations as if fully restated

herein.

97.    The Equal Protection Clause of the Fourteenth Amendment to the U.S.

Constitution provides that "no state shall… deny to any person within its jurisdiction

the equal protection of the laws."

98.    42 U.S.C. § 1983 protects against the "deprivation of any rights,

privileges, or immunities secured by the Constitution and laws" by persons acting

under the color of law.

99.    Defendants Public Schools of Petoskey, Deidra Gamble, and Joel

Dohm acted under color of law when they engaged in the conduct described herein,

20

including, but not limited to, discriminating and retaliating against and harassing Plaintiffs, subjecting them to hostile work and educational environments, and failing to address the retaliation K.P. suffered because of her mother's wrongful termination.

100. Defendants retaliated against Plaintiffs because Plaintiff Parker engaged in the same type of speech that similarly situated male coaches at PHS engage in regularly without rebuke or consequence.

101. Defendants thereby violated Plaintiffs' clearly established constitutional rights, of which any reasonable person in their positions would have known.

102. Plaintiff K.P. maintains a close relationship with her mother, Plaintiff Parker.

103. But for Plaintiff K.P.'s relationship with Plaintiff Parker, she would not have suffered the damages described herein—subjecting Plaintiff Parker to additional emotional distress and guilt because of the consequences to her daughter.

104. Defendants' actions would have deterred a parent of ordinary firmness from continuing to assert her right to equal protection.

105. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant harm, injury, and damages, including, but not limited to, Plaintiff Parker's removal from her position as varsity volleyball coach,

loss of income; loss of career, educational, and athletic opportunities; loss of earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT III
### Retaliation in Violation of the First Amendment to the U.S. Constitution
### 42 U.S.C. § 1983
*(On behalf of both Plaintiffs and as to Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm)*

106. Plaintiffs incorporate the preceding allegations as if fully restated herein.

107. As incorporated by the Fourteenth Amendment, the First Amendment protects an individual from having her constitutionally protected free speech rights infringed upon by governmental agencies. *Banks v. Wolfe County Bd. of Education*, 330 F.3d 888, 892 (6th Cir. 2003).

108. The First Amendment, further, disallows retaliation against an individual who has exercised her free speech rights. *Id*.

109. Plaintiff Parker engaged in constitutionally protected conduct when coaching the PHS varsity volleyball team and standing up for her rights in response to Defendants' statements and actions described herein.

110. The First Amendment is also violated where the speech that invoked the retaliatory response was not made by a plaintiff herself, but rather by a person in

a close relationship with the plaintiff, including a parent. *Fannon v. Patterson*, No. 3:13-cv-14, 2014 U.S. Dist. LEXIS 120899, at *11-13 (S.D. Ohio Aug. 29, 2014).

111. Defendants retaliated against Plaintiffs because Plaintiff Parker engaged in the same type of speech that similarly situated male coaches at PHS engage in regularly without rebuke or consequence.

112. Plaintiff K.P. maintains a close relationship with her mother, Plaintiff Parker.

113. But for Plaintiff K.P.'s relationship with Plaintiff Parker, she would not have suffered the damages described herein—subjecting Plaintiff Parker to additional emotional distress and guilt because of the consequences to her daughter.

114. Defendants' actions would have deterred a parent of ordinary firmness from continuing their protected speech.

115. 42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

116. Defendants acted under color of law when they engaged in the conduct described herein, including, but not limited to, discriminating and retaliating against and harassing Plaintiffs, subjecting them to hostile work and educational environments, and failing to address the retaliation K.P. suffered as a result of her mother's wrongful termination.

117. Defendants thereby violated Plaintiffs' clearly established constitutional rights, of which any reasonable person in their positions would have known.

118. As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant harm, injury, and damages, including, but not limited to, Plaintiff Parker's removal from her position as varsity volleyball coach, loss of income; loss of career, educational, and athletic opportunities; loss of earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT IV**
**Violation of 29 U.S.C. § 3248**
**42 U.S.C. § 1983**
*(On behalf of both Plaintiffs and as to Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm)*

119. Plaintiffs incorporate the preceding allegations as if fully restated herein.

120. 29 U.S.C. § 3248 provides, in relevant part, that "[n]o individual shall be excluded from participation in, denied the benefits of, [or] subjected to discrimination under" any program receiving federal funding "because of… sex."

121. Defendant receives federal funding for the provision of elementary, middle, and high school education.

122.  42 U.S.C. § 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

123.  Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm acted under color of law when they engaged in the conduct described herein, including, but not limited to, discriminating and retaliating against and harassing Plaintiffs, subjecting them to hostile work and educational environments, and failing to address the retaliation K.P. suffered because of her mother's wrongful termination.

124.  Defendants retaliated against Plaintiffs because Plaintiff Parker engaged in the same type of speech that similarly situated male coaches at PHS engage in regularly without rebuke or consequence.

125.  Plaintiff K.P. maintains a close relationship with her mother, Plaintiff Parker.

126.  But for Plaintiff K.P.'s relationship with Plaintiff Parker, she would not have suffered the damages described herein—subjecting Plaintiff Parker to additional emotional distress and guilt because of the consequences to her daughter.

127.  Defendants' actions would have deterred a parent of ordinary firmness from continuing to assert her right to equal treatment on the basis of sex.

128.   As a result of Defendants' actions, Plaintiffs were "excluded from participation in, denied the benefits of, [and] subjected to discrimination under" the federally funded educational program at PHS.

129.   Defendants thereby violated Plaintiffs' clearly established federal right to be free from sex discrimination and retaliation, of which any reasonable person in that position would have known.

130.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant harm, injury, and damages, including, but not limited to, Plaintiff Parker's removal from her position as varsity volleyball coach, loss of income; loss of career, educational, and athletic opportunities; loss of earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT V**
**Sex Discrimination in Violation of Title IX**
**20 U.S.C. §§ 1681**
*(On behalf of Plaintiff Parker and as to Defendant Public Schools of Petoskey)*

131.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

132.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

133.    Plaintiff Parker, as a female, is a member of a protected class.

134.    As a public school district, Defendant Public Schools of Petoskey received and continues to receive federal financial assistance.

135.    Defendant Public Schools of Petoskey subjected Plaintiff Parker to intentional discrimination including, but not limited to, discriminating against Plaintiff Parker based on her gender and terminating her employment as varsity volleyball coach.

136.    Defendant Public Schools of Petoskey applied its policies and procedures in a manner that discriminated against Plaintiff Parker on the basis of sex, causing her serious and unjustified damage. Defendant Public Schools of Petoskey treated Plaintiff Parker less favorably than other comparable coaches who were male and outside of her protected class.

137.    Bias against tough female coaches was a motivating factor behind the actions described in this Complaint, including, but not limited to, discriminating against Plaintiff Parker based on her gender and discriminatorily terminating her employment as varsity volleyball coach.

138.    Plaintiff Parker was subjected to biased, prejudiced and unfair treatment in violation of Title IX, motivated by a desire to punish her for her sex.

139.    But for her sex, Plaintiff Parker would not have suffered the discrimination and retaliation she faced.

140. As a direct and proximate result of Defendants' unlawful actions, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, removal from her position as varsity volleyball coach, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**COUNT VI**
**Sex Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act**
**M.C.L. § 37.2101 *et seq.***
*(On behalf of Plaintiff Parker and as to Defendants Public Schools of Petoskey, Deidra Gamble, and Joel Dohm)*

141. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

142. Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") provides that a person may not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status." M.C.L. 37.2302(a).

143. Plaintiff Parker, as a female, is a member of a protected class. Defendant Public Schools of Petoskey is a place of accommodation as defined by the ELCRA.

144. Defendants Gamble and Dohm are each a "person" as defined by the ELCRA.

28

145. Defendants subjected Plaintiff Parker to intentional discrimination including, but not limited to, discriminating against Plaintiff Parker based on her gender and discriminatorily terminating her employment as varsity volleyball coach.

146. Defendants applied their policies and procedures in a manner that discriminated against Plaintiff Parker on the basis of sex, causing her serious and unjustified damage. Defendants treated Plaintiff Parker less favorably than other comparable coaches who were male and outside of her protected class.

147. Bias against tough female coaches was a motivating factor behind the actions described in this Complaint, including, but not limited to, discriminating against Plaintiff Parker based on her gender and terminating her employment as varsity volleyball coach.

148. Plaintiff Parker was subjected to biased, prejudiced and unfair treatment in violation of the ELCRA, motivated by a desire to punish her for her sex.

149. But for her sex, Plaintiff Parker would not have suffered the discrimination and retaliation she faced.

150. As a direct and proximate result of Defendants' unlawful actions, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, removal from her position as varsity volleyball coach, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT VII
### Breach of Contract
*(On behalf of Plaintiff Parker and as to Defendant Public Schools of Petoskey)*

151. Plaintiff incorporates the preceding allegations as if fully set forth herein.

152. The terms of the CBA applicable to Plaintiff's employment with Defendant Public Schools of Petoskey provides that non-teachers may only be hired for coaching positions if no qualified teacher has applied.

153. However, although Plaintiff was objectively qualified for the PHS softball coaching position to which she applied in 2023, meeting all listed qualifications, a male coach who did not teach at Petoskey was hired over her, in direct violation of the terms of the CBA.

154. Defendant Public Schools of Petoskey breached the CBA.

155. As a direct and proximate result of Defendant Public Schools of Petoskey's breach of the CBA, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT VIII
### Defamation
*(On behalf of Plaintiff Parker and as to Defendants Deidra Gamble, Joel Dohm, and Sara Jonker)*

156.  Plaintiff incorporates the preceding allegations as if fully set forth herein.

157.  As discussed *supra*, Defendants Gamble and Dohm engaged in explicitly defamatory communications amongst one another and with PHS parents and students about Plaintiff Parker's qualifications and performance as varsity volleyball coach, baselessly impugning her professional reputation.

158.  On April 18, 2023, Defendant Jonker made false and defamatory statements about Plaintiff Parker, including statements falsely accusing Plaintiff Parker of homophobia, fat shaming, leading by fear, getting "crazier and crazier," and engaging in "lots of weird stuff," falsely claiming that Plaintiff Parker "really went nuts" and baselessly noting purported concerns about her mental health, which Defendant Dohm took notes on, transmitting them to other PHS administrators and placing them in Plaintiff Parker's personal file.

159.  On September 21, 2023, Defendant Dohm transmitted to other PHS administrators and placed in Plaintiff Parker's personal file notes falsely portraying Plaintiff Parker as immature and falsely accusing her of starting drama.

160.  On October 26, 2023, Defendant Dohm transmitted to other PHS administrators and placed in Plaintiff Parker's personnel file notes falsely accusing Plaintiff Parker of creating turmoil in the volleyball program, unethical conduct, and other policy violations.

161.    On November 1, 2023, during a discussion of the softball coach hiring committee, Defendants Gamble and Dohm falsely portrayed Plaintiff Parker as difficult, falsely accused her of repeatedly causing problems during her tenure as volleyball coach, unjustifiably impugned her professional abilities, and falsely portrayed her as unqualified for the position to District Superintendent Jeff Leslie, Board of Education President Mark Ashley, and parent Chad Howard.

162.    During a phone conversation on January 19, 2024, Defendants Dohm and Gamble falsely accused Plaintiff Parker of "saying bad things about [Dohm] in the community," which was transmitted to other PHS administrators and memorialized in notes placed in Plaintiff Parker's personal file.

163.    Since Plaintiff Parker's termination, her defamation by Defendants has spread throughout Plaintiff Parker's local and professional communities.

164.    Through fault amounting at least to negligence, Defendants made unprivileged communications about Plaintiff Parker to third parties that were both false and defamatory.

165.    The false statements published by Defendants were defamatory *per se*, as the assertions of professional incompetence or integrity would harm Plaintiff Parker's business or profession. *Burden v. Elias Bros. Big Boys Rest.*, 613 N.W.2d 378, 381-82 (Mich. App. No. 204788 7/11/00), 240 Mich. App. 723.

32

166.    Where defamation *per se* has occurred, the person defamed is entitled to recover general damages in at least a nominal amount… Where the defamatory publication is 'maliciously published,' the person defamed may recover 'substantial damages' even where no special damages could be shown." *Whitemore v. Weiss*, 33 Mich. 348, 353 (1876).

167.    Whether nominal or substantial, where there is defamation *per se*, the presumption of general damages is well settled. *McCormick v. Hawkins*, 169 Mich. 641, 650; 135 N.W.2d 1066 (1912).

168.    Furthermore, "where, as here, the defamation is slanderous *per se*, … damages for injury to feelings, otherwise called exemplary or punitive damages, may be found in the absence of damages of a pecuniary nature." *Poledna v. Bendix Aviation Corp.*, 360 Mich. 129, 145, 103 N.W.2d 789 (1960).

169.    Further, Plaintiff Parker suffered actual harm resulting from Defendants' publication of false and defamatory information, consisting at least in the loss of her coaching position, her exclusion from consideration for other coaching positions, and the earning opportunities resulting therefrom.

170.    Plaintiff Parker did not—and could not reasonably—learn of this defamation until November 22, 2024, and as such this claim is timely under Michigan law.

171.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, removal from her position as varsity volleyball coach, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT IX
### False Light Invasion of Privacy
*(On behalf of Plaintiff Parker and as to Defendants Deidra Gamble, Joel Dohm, Nate Gross, and Sara Jonker)*

172.    Plaintiff incorporates herein by reference each of the foregoing paragraphs.

173.    Defendants published the defamatory communications discussed *supra* to Plaintiff Parker's colleagues, community members, and to the public in general.

174.    The content of these defamatory communications was unreasonable and highly objectionable in that they attributed to Plaintiff Parker characteristics, conduct, or beliefs that were false and that placed her in a false position.

175.    Specifically, without limitation, Defendants falsely and publicly portrayed Plaintiff Parker as crazy, dramatic, unqualified, homophobic, fat-shaming, and responsible for turmoil in the PHS volleyball program.

176.    Defendants knew of or acted in reckless disregard as to the falsity of these defamatory communications and the false light in which Plaintiff Parker would

34

be placed when they were disseminated to the public in general and/or to a large number of people, and therefore they acted with actual malice.

177.  As a direct and proximate result of Defendants' unlawful actions, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, removal from her position as varsity volleyball coach, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT X
### Tortious Interference with Business Relations
*(On behalf of Plaintiff Parker and as to Defendants Deidra Gamble, Joel Dohm, Nate Gross, and Sara Jonker)*

178.  Plaintiffs incorporate the preceding allegations as if fully set forth herein.

179.  The elements of tortious interference with a business relationship in Michigan are "(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005).

180.   There existed a valid business relationship or expectancy between Plaintiff Parker and Defendant Public Schools of Petoskey.

181.   Defendants Gamble, Dohm, Gross, and Jonker at all relevant times had knowledge of the relationship or expectancy between Plaintiff Parker and Defendant Public Schools of Petoskey.

182.   Defendants Gamble, Dohm, Gross, and Jonker intentionally interfered with this business relationship or expectancy by inducing or causing a breach or termination of the business relationship or expectancy, as set forth above.

183.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff Parker has suffered significant harm, injury, and damages, including, but not limited to, removal from her position as varsity volleyball coach, loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

## COUNT XI
### Intentional Infliction of Emotional Distress
*(On behalf of both Plaintiffs and as to Defendants Deidra Gamble, Joel Dohm, Nate Gross, and Sara Jonker)*

184.   Plaintiffs incorporate the preceding allegations as if fully set forth herein.

185.   Defendants Dohm, Gross, and Jonker have continuously spread false and harmful information about Plaintiffs.

36

186.    Defendants Dohm, Gross, and Jonker have gone so far as to spread this false information to potential employers of Plaintiff Parker.

187.    Defendants Dohm, Gross, and Jonker inappropriately destroyed Plaintiff Parker's reputation and improperly participated in the conversations that led to the results outlined herein.

188.    The conduct of Defendants Dohm, Gross, and Jonker outlined in this Complaint was extreme, outrageous, and of a character not to be tolerated by a civilized society.

189.    The conduct of Defendants Dohm, Gross, and Jonker resulted in severe and serious emotional distress to both Plaintiffs.

190.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant harm, injury, and damages, including, but not limited to, Plaintiff Parker's removal from her position as varsity volleyball coach, loss of income; loss of career, educational, and athletic opportunities; loss of earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

**RELIEF REQUESTED**

Wherefore, Plaintiff requests that this Honorable Court grant the following relief:

a. Declare that Defendants' practices and actions violated the U.S. Constitution, Title IX, 29 U.S.C. § 3248, the ELCRA, and Michigan common law;

b. Award Plaintiff all lost wages and benefits, past and future, to which she is entitled;

c. Award Plaintiff appropriate equitable relief;

d. Award Plaintiff compensatory damages;

e. Award Plaintiff exemplary and/or punitive damages;

f. Award Plaintiff reasonable attorney fees, costs, and interest; and

g. Award such other relief as this Court deems just and proper.

Respectfully Submitted,

**NACHTLAW, P.C.**

/s/ Grace Cathryn Cretcher

Dated: November 20, 2025

Grace Cathryn Cretcher
*Attorneys for Plaintiffs*

38

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff CASIE PARKER, on her own behalf and on behalf

of her minor daughter K.P., by and through her attorneys, NACHTLAW, P.C., and

hereby demands a trial by jury in the above-captioned matter for all issues so triable.

Respectfully Submitted,

**NACHTLAW, P.C.**

/s/ Grace Cathryn Cretcher

Dated: November 20, 2025     Grace Cathryn Cretcher
*Attorneys for Plaintiffs*